No. 45,627

THE GOODYEAR TIRE & RUBBER COMPANY, *Appellant,* v. EMPLOY-
MENT SECURITY BOARD OF REVIEW OF THE STATE OF KANSAS and
WILLIAM C. SMITH, *Appellees;* THE GOODYEAR TIRE & RUBBER
COMPANY, *Appellant,* v. EMPLOYMENT SECURITY BOARD OF REVIEW
OF THE STATE OF KANSAS and JOHN J. BAUER, *Appellees;* THE
GOODYEAR TIRE & RUBBER COMPANY, *Appellant,* v. EMPLOYMENT
SECURITY BOARD OF REVIEW OF THE STATE OF KANSAS *et al.,*
*Appellees.*

(469 P. 2d 263)

Opinion filed May 9, 1970.

*William G. Haynes,* of Lillard, Eidson, Lewis & Porter, of Topeka, argued
the cause, and *Charles S. Fisher, Jr.* and *Peter F. Caldwell,* of the same firm,
were with him on the brief for the appellant.

*Marvin A. White,* attorney for the Employment Security Board of Review,
argued the cause and was on the brief for the appellee-board of review. *Robert
B. Wareheim,* of McCullough, Parker, Wareheim, LaBunker and Rose, of To-
peka, argued the cause and was on the brief for the appellees-employees.

The opinion of the court was delivered by

O'CONNOR, J.: These three consolidated cases involve the ques-
tion of claimants' eligibility for benefits under the employment
security law (K. S. A. 44-701, *et seq.*). The Goodyear Tire & Rubber
Company (employer) has appealed from a decision of the Shawnee
county district court affirming orders by the Employment Security
Board of Review that claimants (employees) were eligible for bene-

fits for one or both weeks ending August 19 and 26, 1967, during which time the Goodyear plant was partially shut down.

Under the provisions of a collective bargaining agreement between the company and claimants' union, Goodyear had effected a partial shutdown of its plant for vacation purposes for the two weeks' period in question. During the period work was available for certain employees of high seniority, but not for the claimants herein.

The pertinent portions of the bargaining agreement relating to vacations are as follows:

"*Section 1. Eligibility*

"(*a*) Employees will be entitled to one week's vacation with pay after completing one year of continuous service. Employees will be entitled to two weeks' vacation with pay after completing three years' service. . . .

"(*b*) The vacation period shall be on a calendar basis from January 1 to December 31st inclusive. . . .

. . . . . . . . . . . . .

"(*h*) An employee may defer his vacation until the following vacation period but no longer, by making arrangements with the Employer.

"The Employer will make a reasonable effort consistent with production requirements to schedule vacations at times suitable to the employees and to give those employees entitled to two or more weeks vacation the two or more weeks consecutively if they so desire.

. . . . . . . . . . . . .

"(*h*) (1) If the Employer anticipates a vacation shutdown or shutdowns a notice of intent will be posted no later than March 1.

"(2) The Employer will contact employees for vacation scheduling by May 1st.

"(3) The Employer may shut down all or a part of the plant for the specific purpose of scheduling vacations during June, July and August. When total or partial shutdowns for vacations are scheduled such shutdowns will be for two consecutive weeks. Full plant shutdown for vacation shall be limited to one per year or partial plant shutdowns for vacations shall be limited to two per year.

. . . . . . . . . . . . .

"(4) Employees eligible for vacations prior to the shutdown period or periods shall be required to take two weeks of the vacation to which they are eligible during one of the shutdown periods. An exception to this will be employees who elect to defer all or part of their vacation to the next year or have scheduled their vacations some other time during the vacation period defined in paragraph (*b*) of this section. In these events, such employees will be considered on a *leave of absence* during one shutdown period if no work is made available to them. During the other shutdown period if no work is made available to them, such employees will be considered on *layoff*.

"(5) Employees who may have taken their vacations earlier in the year due to emergency or for exceptional valid reasons and employees who are

ineligible for vacations during the shutdown periods will be considered on *layoff* if no work is made available to them.

. . . . . . . . . . . . . .

*Section 2. Pay for Vacations*
"(*a*) Vacations will be paid at the rate of 2% of the previous calendar year's earnings for each week of vacation to which the employee is entitled." (Emphasis added.)

In a separate article of the agreement entitled "SENIORITY," provision is made that a laid-off employee will be eligible for recall. In respect to *leaves of absence,* the provision states that those of a short duration may be negotiated on a "local basis," and may also be granted for personal reasons, when justified, for a period not to exceed ninety days. In any case, seniority continues to accumulate for the duration of approved leaves of absence.

The parties agree that under the terms of the collective bargaining agreement employees were not compelled to take their vacations during the shutdown period but could take them at other times during the year, or could defer them until the following year, at the employees' option.

The facts are not in controversy. The claimant in each of the first two cases was entitled to at least two weeks' vacation with pay under the terms of the agreement. They chose to take only one week of their paid vacation during the shutdown (the week ending August 19, 1967). As to each of these claimants, the examiner, referee, board of review, and district court concluded that for the week ending August 19 claimants were on vacation and receiving vacation pay and, therefore, were ineligible for unemployment benefits; but they were unemployed and eligible for benefits for the last week of the shutdown period ending August 26.

The thirty-eight claimants in the third case, some of whom were entitled to one week's vacation with pay, and some to two or more weeks, elected not to take any portion of their vacations during the two-week shutdown period, but rather to take them at some other time during the year, or defer them until the following year. As to these claimants, the administrative authorities, including the board of review, and the district court concluded they were eligible for unemployment benefits for both weeks of the shutdown period.

Pursuant to K. S. A. 44-709 (*c*) [Am. L. 1970], the referee conducted a hearing in each of the cases, after which he filed a lengthy memorandum opinion setting forth his findings of fact (about which there is no dispute) and decision. The various contentions of both

the claimants and Goodyear were examined in light of the terms of the bargaining agreement and the employment security law. As the referee viewed the agreement, there was nothing in it which prevented an employee from requesting such vacation as he was entitled to for any period during the year, and if approved by the employer, to be a binding election. The referee, in effect, concluded that in applying the law, he must look to the actual status of the claimant when he claims eligibility for benefits, irrespective of the terms "leave of absence" and so forth used in the agreement; and that each of the claimants was "unemployed" within the meaning of K. S. A. 44-703 (*m*) [Am. L. 1970] for those weeks during the shutdown period when he did not receive vacation pay. Upon appeal by the employer (K. S. A. 44-709 [*e*] [Am. L. 1970]) the Employment Security Board of Review adopted the referee's findings and conclusions, just as did the district court when Goodyear unsuccessfully sought judicial review (K. S. A. 44-709 [*h*] [Am. L. 1970]) of the board's decision. The appeal to this court by Goodyear followed.

The question for determination is whether the claimants are eligible for unemployment benefits for the week(s) during the two-week shutdown period, when they elected to take at some other period of time all or part of their paid vacations to which they were entitled under the bargaining agreement.

Goodyear contends that since the claimants, by their own choice, elected to take their paid vacations at a time other than during the vacation shutdown period, they were to be considered on a "leave of absence" status according to the labor-management contract and, therefore, were not eligible for benefits under the employment security law. At the same time they acknowledge that employees, if on a "layoff" status, such as those who were ineligible for vacation during the shutdown (subparagraph [*h*] [5] of the contract), would be eligible for benefits.

Claimants and the board of review take a contrary position and contend that no work was available or wages payable to claimants during the period of shutdown, and thus, they were "unemployed," as defined by K. S. A. 44-703 (*m*), and eligible for benefits. The pertinent terms of that statute are:

". . . An individual shall be deemed 'unemployed' with respect to any week during which he performs no services and with respect to which no wages are payable to him. . . ."

The collective bargaining agreement between Goodyear and the union constituted the employment contract between the company and its employees. Incorporated as a part of the agreement were provisions relating to vacation rights—both as to when employees became eligible for vacations with pay, and the time that such vacations would be taken. The company reserved unto itself the right to shut down all or part of its plant for two weeks for the specific purpose of vacations. At the same time the company agreed to make a reasonable effort "consistent with production requirements to schedule vacations at times suitable to the employees." Employees eligible for vacations prior to the shutdown period were required to take two weeks of the vacation to which they were entitled during the shutdown, except for those employees who elected to defer all or part of their vacation to the following year, or had scheduled their vacation for some other time during the vacation period, in which case they were to be considered on a "leave of absence." Provision was also made when employees would be considered on "layoff" during a second partial shutdown period during the vacation year.

No contention is made by either side that the company or the employees have violated the terms of this agreement in any respect. It is generally agreed that insofar as the contract is concerned, claimants had the right to take their vacations when they did. The company's complaint undoubtedly stems from the fact that by the employees being found eligible for unemployment benefits for the shutdown period, the company's experience rating is being charged accordingly. (K. S. A. 44-710a [Am. L. 1970].)

In light of the terms of employment, as defined by the collective bargaining agreement, were claimants, under the uncontroverted facts, eligible for benefits? Determination of the question lies within the provisions of the employment security act, with the person claiming benefits thereunder being entitled to a liberal interpretation of the law. (*Pickman v. Weltmer*, 191 Kan. 543, 382 P. 2d 298; *Southwestern Bell Telephone Co. v. Employment Security Board of Review*, 189 Kan. 600, 371 P. 2d 134, 93 A. L. R. 2d 1312; *Erickson v. General Motors Corporation*, 177 Kan. 90, 276 P. 2d 376.)

The condition precedent for eligibility under the law is that a claimant be "unemployed." He is deemed unemployed with respect to any week during which (1) he performs no services, and (2) no wages are payable to him. (K. S. A. 44-703 [*m*].) Clearly,

the claimants here performed no services during the two weeks of the plant shutdown. As a result of their choosing to postpone all or part of their paid vacations to another time of the vacation year, or the following year, no wages were payable to them. (We note that no attempt is made to allocate vacation pay to the specific weeks of the shutdown period, which in some jurisdictions has been a pivotal point in determining eligibility [Anno. 30 A. L. R. 2d 366 § 2].)

In a literal sense, both parts of the statutory condition for an employee to be deemed "unemployed" existed as to the claimants in these cases. The second part of the condition—no wages being payable—came about because of claimants' voluntarily electing not to take all or part of their entitled vacations with pay during the shutdown period. While under the bargaining contract claimants had a perfect right to make such an election, they also agreed under its specific terms to be considered on a "leave of absence" status, a situation which the board of review and district court, in effect, ignored. Claimants' unemployment in this factual context was voluntarily created and consented to, and must be regarded as beyond the spirit and purview of our act.

The declared public policy of this state, as expressed in the act itself, is protection against *involuntary unemployment.* (K. S. A. 44-702.) In further amplification of the purpose of the act, this court, in *Clark v. Board of Review Employment Security Division,* 187 Kan. 695, 359 P. 2d 856, said:

". . . the basic concept of the act . . . is, to provide benefits for those *who are unemployed through no fault of their own* and who are willing, anxious and ready to support themselves and their families, and *who are unemployed because of conditions over which they have no control;* . . ." (Emphasis added.) (p. 698.)

As a part of their agreement with Goodyear, claimants agreed to the shutdown period. They also agreed that if they elected to postpone or defer their paid vacation to another time, they would be considered on a leave of absence during the shutdown. The term "leave of absence" contemplates some voluntary act on the part of the employee. (See, *Jones v. Metropolitan Life Ins. Co.,* 156 Pa. Super. 156, 39 A. 2d 721.) Under such circumstances the shutdown can well be equated to a vacation or absence without pay voluntarily consented to by the claimants as part of the collective bargaining agreement. By the provisions of the contract,

if claimants elected to take their paid vacation at other than during the vacation shutdown, they agreed, in effect, to withdraw themselves temporarily from the labor force and become voluntarily unemployed. (See, *In re Chichipas*, 3 A. D. 2d 880, 161 N. Y. S. 2d 362.)

This agreement is not one to waive rights to benefits to which an employee otherwise would be entitled; rather, it is one whereby the employees agreed to a voluntary absence from work if they chose to exercise that right. Such an agreement cannot be interpreted to mean an agreement to waive, release or commute benefits as prohibited by the employment security act. (K. S. A. 44-718; *Jackson v. Minneapolis-Honeywell Regulator Co.*, 234 Minn. 52, 47 N. W. 2d 449.)

With respect to vacation pay, Goodyear stood ready and willing to pay all eligible employees during the partial shutdown of the plant, and was obligated to do so under the terms of the bargaining agreement. Claimants, however, elected to exercise their right under the agreement to assume a status of voluntary unemployment and, thus, did not become unemployed because of conditions over which they had no control within the contemplation of our act.

The manner in which the terms "leave of absence" and "layoff" are used in the collective bargaining agreement clearly indicates that the parties intended a separate and distinct connotation to be given to each of the phrases.

"Leave of absence" is not a complete separation from employment, although it implies some voluntary act on the part of the employee. It denotes a continuity of the employment status—a temporary absence from duty, with intention to return—during which time performance of the duties of his work by the employee and remuneration by the employer are suspended. (See, *Chenault v. Otis Engineering Corp.*, Tex. Civ. App., 423 S. W. 2d 377; Black's Law Dictionary [Rev. 4th Ed.] p. 1036.)

A "layoff" is looked on as at least a suspension of employment, and in some instances as termination thereof, at the will of the employer without prejudice to the worker being reemployed. (See, 56 C. J. S., Master and Servant § 29.) Certainly it implies no element of voluntariness on the part of the employee. In those situations where an employee is considered on "layoff" under the terms of the bargaining agreement, he is involuntarily unemployed if no work is made available to him.

Our research discloses a plethora of cases from other jurisdictions dealing with the right to unemployment compensation where there is a plant shutdown for vacation purposes. A review of these cases would be impracticable because of the differences in the terms of the collective bargaining agreements and the unemployment compensation statutes involved. Most of the cases on the subject deal with situations where employees had not worked for a sufficient time to be eligible for vacation pay when the plant was shut down for vacation purposes. (Annos. 8 A. L. R. 2d 433; 30 A. L. R. 2d 366.) Even in those instances there is respectable authority holding that employees who had no earned vacation time were bound by the collective bargaining agreement permitting a plant vacation shutdown and were *not involuntarily* unemployed, since they consented to the shutdown by the terms of the agreement. (*Moen v. Director of the Division of Employment Security,* 324 Mass. 246, 85 N. E. 2d 779, 8 A. L. R. 2d 429; *Jackson v. Minneapolis-Honeywell Regulator Co.,* supra; *Mattey v. Unemployment Compensation Board,* 164 Pa. Super. 36, 63 A. 2d 429; *In re Emp. of Buffelen Lbr. & Mfg. Co.,* 32 Wash. 2d 205, 201 P. 2d 194; *Lynch Corp. v. Review Bd. of Ind. Empl. Sec. Div.,* 141 Ind. App. 694, 232 N. E. 2d 619.) The principles and reasoning found in many of these decisions are, we believe, of persuasive force.

In *Jackson v. Minneapolis-Honeywell Regulator Co.,* supra, under statutes similar to ours, the employee was held to be voluntarily unemployed during the shutdown period and, therefore, not entitled to benefits. Although factually not in point, the reasoning applied is apropos. The court stated:

". . . During the two weeks of the vacation shutdown, Jackson performed no services and received no wages. The wording of the act and the existing facts place him squarely within the class defined by the act during those two weeks. If nothing further appeared, it is evident that he would be entitled to unemployment benefits. He and his family were exposed to a 'menace to . . . health, morals, and welfare,' and there was a loss of the purchasing power which the act seeks to maintain. Thus, to that extent the facts meet all the specifications for qualification for receipt of unemployment compensation benefits. But those specifications indicating qualification for benefits would also have been met if Jackson had asked for a two-week layoff and the company had granted his request.

"The act was designed to meet only the evils which follow 'involuntary unemployment,' with benefits to be paid to 'persons unemployed through no fault of their own.' It was not designed to take care of the same evils which might flow from voluntary unemployment." (pp.56-57.)

In a like vein, the court, in *Mattey v. Unemployment Compensation Board of Review,* supra, said:

"It is true that during the vacation period claimant performed 'no services,' and with respect to which 'no remuneration' was paid or payable to him. To that extent he was 'unemployed.' . . . However, the relationship of employer and employe was not terminated, and there was no suspension of that relationship. . . . The vacation or the leave of absence which he enjoyed was by virtue of his agreement. The vacation provided by the agreement was a period of freedom from duty but not the end of employment; 'vacation' implies continued service. . . . The effect of the agreement is the same as if claimant had himself requested time off for a vacation, or other personal reason, and it had been granted by his employer. Such mutuality does not create a state of unemployment under the statute, which entitles claimant to unemployment compensation benefits. The situation was created by claimant's duly selected bargaining agents; their acts were his acts; to the temporary cessation of work the employer and employe agreed. The circumstances afford no basis for the claim that he was unemployed within the meaning of the Unemployment Compensation Law. . . ." (pp. 39-40.)

The same rationale is found in *Lynch Corp. v. Review Bd. of Ind. Empl. Sec. Div.,* supra, where employees who disregarded the company's timely notice of a vacation shutdown chose to take their vacations at a time other than during the shutdown period. The court held, by virtue of their action the employees should not be permitted to receive an additional "two week vacation with pay, in the form of unemployment compensation," since such a result would not be in harmony with the declared policy of the Indiana employment security act—to alleviate the hardships brought about by the loss of wages or income when an employee is involuntarily without employment. (Also, see, *American Central Mfg. Corp. v. Review Board,* 119 Ind. App. 430, 88 N. E. 2d 256.)

In addressing itself to the general subject of an employee's right to unemployment compensation had he postponed his vacation (as claimants did here) to a time subsequent to the vacation period fixed by the company, the supreme court of Illinois, in *Grobe v. Board of Review,* 409 Ill. 576, 101 N. E. 2d 95, said:

". . . any later vacation he [the employee] might have elected to take would have been voluntary unemployment on his part and would not have been compensable under the act." (p. 582.)

Admittedly, this appeal presents a close question; but the majority of the court is of the opinion that the declared public policy stated in the employment security law itself compels the conclusion that

the claimants were voluntarily unemployed and, therefore, are not eligible for benefits.

The judgment is reversed.

FROMME, J., dissenting: As I view the majority opinion it holds that eligibility for unemployment compensation depends upon terms, such as "leave of absence", used in a labor-management contract, at least that is the method used in the opinion to justify the decision reached. In the future this court will be asked to construe each labor-management contract applicable to the period for which compensation is claimed to see if an employee is "laid-off" or on a voluntary "leave of absence". This will create an intolerable situation for the Employment Security Division as well as this court.

For instance the labor-management contract in the present case provided:

"(5) Employees who may have taken their vacations earlier in the year due to emergency or for exceptional valid reasons and employees who are ineligible for vacations during the shutdown periods will be considered on layoff if no work is made available to them."

Under this paragraph the employer determines what vacations are taken earlier in the year *due to emergency* or for *exceptional valid reasons* and based upon the employer's determination the vacation shutdown will entitle certain employees to be considered "on layoff". The use of the term "layoff" under such circumstances cannot bind the employment compensation division to pay compensation unless the employees qualify under the act. The majority opinion indicates that if this portion of the contract is later changed at the bargaining table to read "leave of absence" that eligibility would then be denied. If we permit this, the company's success at the bargaining table may in the future wholly exclude an employee from benefits under the act, and the union's success at the bargaining table would have the opposite result. In such case the employee is left at the mercy of the union and management negotiations over which he has little control, except for one small vote.

The Employment Security Law is complete in itself. Compensation for unemployment provided by the act depends upon the specific provisions of the act. The labor-management contract should have no controlling effect upon payment of compensation. The majority opinion construes the use of the term "leave of absence" used in the contract and denies compensation to these

claimants. The act itself provides that no agreement to waive, release or commute rights to benefits is valid. (K. S. A. 44-718)

This court should not permit the results reached by labor and management at the bargaining table to affect the statutory provisions of the employment security act. It is of no significance what terms the parties use at the bargaining table when they refer to the status of an employee during a plant shutdown. The terms "leave of absence" or "layoff" are not used in the employment security act and have no controlling effect upon eligibility for compensation.

An Ohio court, in reaching an opposite conclusion to what will now be the law of Kansas, expresses my reaction to the reasoning adopted by the majority. In *Dahman v. Commercial Shearing & Stamping Co.*, 13 O. O. (2d) 368, 170 N. E. 2d 302, that court said:

". . . Playing with phrases like 'vacation without pay' or 'leave of absence' stems from a want of better terms to avoid the words 'laid-off'. . . ." (p. 369)

The majority opinion admits *"in a literal sense"* that the statutory conditions exist which render these employees unemployed. As to these employees the plant was shut down. There was no work available to them during these periods. They drew no wages and no vacation pay was attributable to them for these periods. They were unemployed as that word is defined by the act and by our previous case law.

The majority opinion turns on a finding that the unemployment resulted from a voluntary leave of absence because of the labor-management contract.

In the present case the union neither sought nor obtained the provision in the contract which permits the company to shut down the plant. The shutdown was for the company's benefit in scheduling vacations. The company agrees that these employees were not required to schedule vacations during these particular periods and that vacation pay was not attributable to the employee during these periods. To say that these men were unavailable for work or that they were unemployed of their own volition overlooks the fact that there was no work available for them at the plant. (See *Combustion Engineering, Inc., v. O'Connor*, [Mo. App.] 395 S. W. 2d 528.)

The employment security act seeks to avert the hardships arising from a plant shutdown on those who have no work, no wages and

no vacation pay for the shutdown period. These employees had their vacation pay tied to another period when they would not work and would draw no wages. If a vacation was deferred the vacation pay was likewise deferred.

Our employment security act specifies those periods of unemployment when an employee is disqualified for benefits. (K. S. A. 44-706) An employee is disqualified for benefits when the plant shutdown arises from a labor dispute. Various other specific disqualifications are built into the act. There is no disqualification for benefits during a plant shutdown because of vacations. Any change in the act should be left to the legislature.

The courts are divided on the question we are deciding here. The modern trend of authorities, in my opinion, upholds eligibility when the shutdown is for the benefit of the employer and when vacation pay is not made attributable to the period of shutdown. (See *Dudley, Admr., v. Morris,* 10 Ohio St. 2d 235, 227 N. E. 2d 231; *Combustion Engineering, Inc., v. O'Connor,* supra; *Texas Emp. Com. v. Huey,* 161 Tex. 500, 342 S. W. 2d 544; *Ungarean Unempl. Compensation Case.,* 207 Pa. Super. 506, 218 A. 2d 847.)

See also 30 A. L. R. 2d 366.

The Supreme Court of Texas in the Huey case collected decisions from other states on both sides of this question and then made this observation:

"In four of the states whose courts had held the claimants not entitled to benefits, the legislatures have amended their laws to make them eligible. That occurred in Pennsylvania, New Jersey, Massachusetts, and Washington." (161 Tex. 500, p. 508)

The majority opinion gives lip service to our rule that an eligible individual claiming benefits for unemployment under the employment security law is entitled to a liberal interpretation of the law, and the Pickman, Southwestern Bell and Erickson cases are cited. However, the rule was not applied.

In the past this court has consistently held the findings and conclusions of the board of review are conclusive in the absence of fraud if supported by substantial evidence, and the jurisdiction of this court is limited to questions of law. (*Boeing Co. v. Kansas Employment Security Board of Review,* 193 Kan. 287, 392 P. 2d 904.)

What question of law does the present reversal rest upon?

I find no case in which the findings and conclusions of the board of review have been overturned by this court.

In the present case this court has substituted its judgment for the judgment of the examiner, the referee, the board of review and the district court, and has done so by construing the term "leave of absence" as contained in the labor-management contract in such a way as to deny eligibility to the employee.

These employees were unemployed within the specific provisions of the act. The Employment Security Division has consistently interpreted the act to authorize eligibility in this situation since June 1963, when the contract first contained these vacation shut-down provisions.

The judgment of the district court should be affirmed.

O'CONNOR, J. (dissenting): Although the task of authoring the majority opinion fell to my lot, I must respectfully join in the foregoing dissent. In addition, I believe if the legislature had intended that employees not be entitled to unemployment compensation benefits under the circumstances prevailing in the instant cases, the statutes would have so stated. The holding of the majority now makes an employee's eligibility for benefits dependent upon the niceties of expression found in each collective bargaining agreement and disregards the conditions of eligibility specifically enumerated in the act. Actually, the court's interpretation of the agreement in question amounts to a waiver of rights to which an employee is otherwise entitled. Such agreements are invalid under the provisions of the act. (K. S. A. 44-718.)

KAUL, J., joins in the foregoing dissents.